# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| TAJUANA DENNIS, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 3:17-CV-443-BH |
| | § | |
| NANCY A. BERRYHILL, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| **Defendant.** | § | Consent |

## MEMORANDUM OPINION AND ORDER

By consent of the parties and the order of transfer dated April 24, 2017 (doc. 16), this case has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court are *Appellant's Brief*, filed August 21, 2017 (doc. 24), and *Defendant's Response Brief*, filed September 20, 2017 (doc. 25). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.    BACKGROUND[1]

Tajuana Dennis (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying her claims for disability insurance benefits (DIB) under Title II of the Social Security Act (Act) and for supplemental security income (SSI) under Title XVI of the Act. (docs. 1, 24.)

### A.    Procedural History

On September 9, 2013, Plaintiff filed her applications for DIB and SSI, alleging disability beginning February 16, 2013. (R. at 165-66.) Her claims were denied initially and upon

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

reconsideration. (R. at 61-85.) Plaintiff requested a hearing before an administrative law judge (ALJ), and she personally appeared and testified at a hearing on August 25, 2015. (R. at 37-60.) On December 23, 2015, the ALJ issued a decision finding that she was not disabled and denying her claims for benefits. (R. at 16-36.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on February 25, 2016, and included new medical evidence. (R. at 14-15.) The Appeals Council determined that the new evidence did not provide a basis for changing the decision and denied her request for review on December 20, 2016, making the ALJ's decision the final decision of the Commissioner. (R. at 1-6.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on November 3, 1963, and was 51 years old at the time of the hearing. (R. at 30, 165.) She graduated from high school and could communicate in English. (R. at 30.) She had past relevant work experience as a warehouse worker. (R. at 30, 55.)

### 2.    Medical Evidence

On February 16, 2013, Plaintiff presented to the Baylor University Medical Center at Dallas (Baylor) following a motor vehicle collision. (R. at 285-302.) She reported significant pain in her right leg, and her X-rays showed "an acute, obliquely and transversely oriented acute fracture through the right femur" and an "additional fracture through the intertrochanteric region of the proximal femur" leading to her right hip. (R. at 295-97.) Surgery was performed the next day to implant a "dynamic hip screw" into the right hip fracture and a "retrograde intramedullary nail" into her right femur. (R. at 300.) During surgery, the "angle of the [hip] screw was too acute, and the

head of the screw broke off," so two additional "interlocking screws were placed distally." (R. at 302.) The procedure was successful overall, and she was later released in stable condition. (R. at 302.)

On March 12, 2013, Plaintiff returned to Baylor for a follow-up on her surgery. (R. at 276-84.) No infections were identified, and Plaintiff denied pain due to the surgery. (R. 278.) She believed that the incision had "opened slightly," but upon examination, the incision was noted as "healing well" with "no redness, swelling, [or] drainage from the surgical site." (R. at 279.) She reported pain in her right leg, but the physical exam showed that she was "in no apparent distress" and that her "range of motion [was] intact in all extremities." (R. at 279.) She was prescribed Hydrocodone-Acetaminophen for the pain and instructed to "notify [Baylor] of unacceptable pain level." (R. at 279.)

On August 27, 2013, Plaintiff presented to Dr. Cecilia Okafor, D.O., her primary care physician, for hip pain. (R. at 308, 334.) Her physical examination showed no abnormalities, but she had elevated blood pressure of 140/90 and tenderness in her hip. (R. at 308, 334.) Dr. Okafor diagnosed Plaintiff with hypertension and referred her to physical therapy. (R. at 334.)

Beginning October 2, 2013, Plaintiff started a physical therapy program at Wellness Care Centers Rehab (Wellness Care). (R. at 304-06.) At her initial evaluation, she rated the pain in her right hip as "7 out of 10 sitting, walking long distances, and standing." (R. at 304.) Her strength was rated as "4/5" on the left side and "3+/5" on her right side. (R. at 304.) Her current function level was assessed as "sedentary" with limits on walking long distances. (R. at 304.) Her therapy goals were to "walk without a limp, walk long distances, and decrease hip pain." (R. at 304-05.)

From October 8, 2013, to February 4, 2014, Plaintiff received regular chiropractic treatment

at Health First Injury & Pain Center (Health First.) (R. at 339-55, 365-74.) She complained of "constant" pain that was "sharp" and "achy" in her back and right arm. (R. at 340, 343, 346.) Muscle spasms and tenderness were noted, but there had been no loss in her range of motion. (R. at 340, 347.) She received "chiropractic manipulative treatment," electrical stimulation, and hot packs during her treatment. (R. at 340, 342, 345, 347.) During her appointment on October 24, 2013, Plaintiff was assessed as "improved," and her treatment plan was reduced. (R. at 347-48.) At her final evaluation on February 4, 2014, she showed an increased range of motion in her hip and right wrist, and she was discontinued from treatment. (R. at 380.)

On November 27, 2013, Plaintiff received an MRI of her lumbar spine at Mid-Cities Imaging. (R. at 386.) Her "spinal canal diameters [were] normal" and there were "clear foramina and unremarkable joint facets." (R. at 386.) In her L4-5 vertebrae, there was "grade 1 spondylolisthesis . . . associated with long-standing or congenital posterior proliferative changes." (R. at 386.) The results also showed a "3-4 mm posterior central discal substance protrusion/herniation focally" in her L5-S1 vertebrae. (R. at 386.)

On January 10, 2014, Plaintiff presented to Dr. Scott A. Farley, D.O., of the Comprehensive Spine Center of Dallas for an examination of her lumbar back pain. (R. at 387-89.) Plaintiff reported that she had a "significant history of lumbar pain prior to [her car] accident," and that she was "not using any medication, but [was] only on Tylenol at this time." (R. at 387.) Dr. Farley noted that her "past medical history [was] normal other than hypertension and high cholesterol," and that the current "review of systems [was] normal other than cholesterol." (R. at 388-89.) During the physical examination, he noted that Plaintiff could stand on her toes/heels and could "perform tandem gait." (R. at 389.) He noted tenderness in her lumbar spine and her range of motion showed "restricted

forward flexion" in her knees. (R. at 389.) Her lower extremity muscle strength and sensation was rated at "5/5" or normal for all areas, but her lower extremity reflexes were rated at "2/4" on both the right and left sides. (R. at 390.) His diagnostic impressions were paraspinal muscle spasms in her lumbar spine, and discogenic lumbar back pain from trauma. (R. at 390.) He instructed her on stretching and strengthening exercises. (R. at 390.)

On April 4, 2014, Plaintiff met with Dr. Barbara Fletcher, Psy.D, for a consultative psychological examination. (R. at 393-96.) Dr. Fletcher noted several times that Plaintiff "appeared invested in presenting herself as impaired" because her "presentation was inconsistent and dramatic" and "vague when pushed for details." (R. at 393.) She first reported "a couple" of suicide attempts, but she later admitted that "she [had] never attempted suicide." (R. at 394.) She also reported that she could not cook, clean, shop, or care for her personal hygiene on her own, but, after being asked why she could not do these things, she simply said "[my family] don't want me doing nothing [because] they know my situation." (R. at 394.) Dr. Fletcher opined that she had an average intelligence, memory, concentration, judgment, and insight, even though she was "less than cooperative" during the assessment. (R. at 395-96.) She also opined that her "mood was reported as depressed" and her thought process was "circumstantial . . . [but] this did not appear due to the presence of a formal thought disorder, but due to a desire to communicate her distress and an attempt to avoid questions." (R. at 395.) She diagnosed Plaintiff with an unspecific depressive and anxiety disorder and offered a "guarded" prognosis due to self-reported "significant symptoms." (R. at 396.)

On April 17, 2014, Plaintiff met with Dr. Dempsey D. Gordon, D.O., for an orthopedic consultative examination. (R. at 400-07.) She rated her pain as "5/10" that was "sharp and aching in the right hip and thigh." (R. at 401.) She engaged in "daily activities that include[d] limited

household chores, food preparation, dressing, and grooming," but had difficulty and pain when performing them. (R. at 402.) Her neurological assessment showed that she was cooperative, "oriented x3," a good historian, and had an appropriate mood and affect. (R. at 402.) Dr. Gordon noted that her gait was "antalgic favoring the right lower extremity," and she used a cane as an assistive device. (R. at 402.) He found during the musculoskeletal examination that her active range of motion in her right hip had been "diminished and performed with noted discomfort." (R. at 403.) He further determined during the sensorimotor examination that her motor muscle strength was "5/5" in all of her upper and lower extremities, and her sensory function was "intact along all dermatomal distributions bilaterally." (R. at 403.) His diagnostic impressions were mild degenerative joint disease of the right knee and status-post surgery hip fracture. (R. at 404.)

Also on April 17, 2014, Plaintiff received X-rays of her right hip and knee at North Texas Imaging. (R. at 397-99.) The results showed "status post-remote open reduction and internal fixation of the right femoral head and neck," and the diagnostic impression was minimal degenerative hypertrophy in all three compartments of the right knee joint. (R. at 397.)

On April 29, 2014, Plaintiff returned to Dr. Okafor for pain in her chest. (R. at 432.) Her physical examination was normal, except that her blood pressure was significantly elevated at 190/110. (R. at 432.) Dr. Okafor instructed her to take her blood pressure medication daily as prescribed. (R. at 432.) After a lipid profile, she also diagnosed Plaintiff with hyperlipidemia. (R. at 432, 434-35.)

On July 22, 2014, and June 9, 2015, Plaintiff presented to Metrocare Services for treatment for depression.[2] (R. at 437-41, 443-46.) She had been "diagnosed with depression in the 1990s," and

---

[2] Plaintiff also had appointments at Metrocare on July 16, 2015, and August 27, 2014, but she was a "no show" for these appointments. (R. at 436, 442.)

felt that she "need[ed] to be back on [her] medication [because she had] been feeling depressed." (R. at 446.) During her appointment on July 22, 2014, she met with Nurse Maria Mosomi, APN, who noted that she had an intact memory, a normal attention, fair insight, and "oriented x3." (R. at 444.) Nurse Mosomi noted that Plaintiff complained of depression "but denie[d] any [symptoms]." (R. at 445.) Based upon her subjective complaints of depression, Plaintiff was prescribed Zoloft. (R. at 446.) During her appointment on June 9, 2015, she met with Nurse Charles Ejiofor, APN, who noted that Plaintiff reported "mood swings every day," but showed a normal performance in speech, thought process, memory, attention, insight, and judgment. (R. at 439-40.) She was also "oriented x3," with a fair impulse and "flat" affect. (R. at 439.) Nurse Ejiofor instructed her to "restart Zoloft" and meet with her primary care physician regularly. (R. at 437-38.)

On May 15, 2015, Dr. Randal Reid, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) assessment of Plaintiff based upon the medical evidence on record. (R. at 82-84.) Dr. Reid opined that she had the following exertional limitations: could occasionally lift/carry 50 pounds; could frequently lift/carry 25 pounds; could stand/walk for a total of about 6 hours in an 8-hour workday; could sit for a total of about 6 hours in an 8-hour workday; and had an unlimited ability to push/pull. (R. at 82.) He identified no postural, manipulative, visual, communicative, or environmental limitations. (R. at 83.)

On June 8, 2015, Plaintiff was referred by Dr. Okafor for X-rays of her right femur and knee. (R. at 447-49.) Other than the surgically implanted plate and compression screws, "no acute abnormalities [were] noted" in her right femur. (R. at 447.) Her right knee showed "hypertrophic bony spurs arising from the articular margins" but "no fractures or dislocations." (R. at 449.) The diagnostic impression was degenerative joint disease in her right knee. (R. at 449.)

On September 17, 2015, and February 2, 2016, Dr. Okafor completed Medical Source Statements of Ability to do Work-Related Activities (Physical) on behalf of Plaintiff. (R. at 450-55, 458-63.) In both of her statements, she opined that Plaintiff had the following limitations: could occasionally lift/carry up to 10 pounds; could sit for 2 hours; could stand/walk for 30 minutes at one time; could occasionally use her upper extremities to reach, handle, finger, feel, push, or pull; could never use her right foot to operate foot controls; could frequently use her left foot to operate foot controls; and could never climb, balance, stoop, kneel, crouch, or crawl. (R. at 450-53, 458-61.) As support for her opinions, Dr. Okafor pointed to Plaintiff's right hip fracture, knee pain, and X-rays. (R. at 450-51, 458-59.)

### 3. Hearing Testimony

On August 25, 2015, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 37-60.) Plaintiff was represented by an attorney. (R. at 39.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was born on November 3, 1963, and was 51 years old. (R. at 42.) She was "separated" from her husband and was the primary guardian of her 12-year-old son. (R. at 42.) She graduated from high school and had not worked since February 2013. (R. at 42.) Her last job had been "janitorial work and warehouse production," which she left after she had a car accident that broke her femur and hip. (R. at 42-43.) A plate had been surgically inserted into her hip, as well as two screws into her right knee. (R. at 47.)

When asked about her physical limitations, Plaintiff explained that she could stand "probably about five to ten minutes" at one time and could sit "about five to ten minutes" before she had to stand up again. (R. at 43-44.) She could "walk about two houses down" at one time, but she had to

use a cane to do so. (R. at 44.) She had been prescribed a walker, which she only used around the house because it was more "convenient for [her] to take the cane," which had not been prescribed, when she left the house. (R. at 44.) When she tried to walk without the cane, she had frequently fallen when she was "getting out the bed, going into restrooms, or walking to the kitchen." (R. at 45-46.) She also had pain in her right knee, hip, and right hand after the car accident. (R. at 46-47.) She received physical therapy for "about a month or two" after the car accident. (R. at 53.)

Plaintiff further testified that she had been diagnosed as "bipolar and depressive" at Metrocare and had been prescribed Zoloft. (R. at 49-50.) She had trouble concentrating when watching television or reading because she was "always thinking about what's going on or how the wreck happened." (R. at 49.)

### b. VE's Testimony

The VE testified that she had reviewed the vocational information in Plaintiff's file and determined that she had the following past relevant work experience: warehouse worker, DOT 922.687-058 (SVP: 2, medium). (R. at 55.)

The ALJ asked the VE to consider a hypothetical individual of the same age, education, and work history as Plaintiff, and who also had the following restrictions: limited to simple, routine repetitive tasks consistent with unskilled work; able to lift and carry 50 pounds occasionally and 25 pounds frequently; able to sit, stand, or walk for up to 6 hours with normal breaks in an 8-hour workday; and no pushing/pulling/operation of foot controls with the right lower extremity. (R. at 56.)

The VE testified that the hypothetical individual would not be able to perform any of Plaintiff's past relevant work, but this individual could perform jobs that existed in the national and

regional economy, which included the following: production helper, DOT 529.686-070 (SVP: 2, medium), with 36,000 jobs nationally and 2,000 in Texas; laundry laborer, DOT 361.687-018 (SVP: 2, medium) with 92,000 jobs nationally and 6,000 in Texas; and hand packager, DOT 920.587-018 (SVP: 2, medium) with 160,000 jobs nationally and 9,000 in Texas. (R. at 56-57.)

The ALJ then asked the VE to consider another hypothetical individual with the following restrictions: able to occasionally lift/carry 5 pounds; able to stand/walk for at least 2 hours out of an 8-hour workday with the use of a cane or other handheld assistive device; able to sit for 6 hours out of an 8-hour workday; not able to push/pull/operate foot controls with the right lower extremity; occasionally able to balance, stoop, kneel, crouch and climb ramps/stairs; and not able to climb ladders, ropes or scaffolds. (R. at 57-58.) The VE responded that this individual would not be able to perform any job in the national or regional economy. (R. at 58.) Plaintiff's attorney had no questions for the VE. (R. at 58.)

## C.     **The ALJ's Findings**

The ALJ issued a decision denying benefits on December 23, 2015. (R. at 16-36.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of February 16, 2013. (R. at 21.) At step two, the ALJ found that she had the following severe impairments: status post-right hip and femur fracture and degenerative disc disease in the lumbar spine. (R. at 21.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 25.)

Next, the ALJ determined that Plaintiff retained the RFC to perform medium work with the following limitations: lift/carry 50 pounds occasionally and 25 pounds frequently; sit/stand/walk for

6 hours out of an 8-hour workday; unlimited ability to push and pull (including operation of hand and/or foot controls) on the left side; and unable to push/pull or operate foot controls using her right lower extremity. (R. at 26-29.)

At step four, the ALJ determined that Plaintiff was unable to perform any of her past relevant work. (R. at 30.) At step five, the ALJ relied upon the VE's testimony to find her capable of performing work that existed in significant numbers in the national economy, including jobs such as production helper, laundry laborer, and hand packager. (R. at 30-31.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from the alleged onset date of February 16, 2013, through the date of the decision. (R. at 31.)

## D.     New Evidence Submitted to the Appeals Council

Plaintiff timely appealed the ALJ's decision to the Appeals Council and submitted new evidence, which consisted of a Medical Assessment of Ability to do Work-Related Activities (Mental) completed by Dr. Ikechukwu Ofomata of Metrocare on January 26, 2016.[3] (R. at 466-69.) He opined that Plaintiff had "some loss" in: understanding and carrying out instructions; sustained concentration and persistence; and responding appropriately to supervisors, co-workers, and usual work situations. (R. at 466-67.) He also opined that she had "substantial loss of ability" to adapt to changes in a routine work setting, she would be absent from work more than 4 days a month due to her impairments, and her mental disorders "probably do exacerbate the degree of disability [she] experienced from his/her physical impairments." (R. at 467-68.)

The Appeals Council denied Plaintiff's request for review on December 20, 2016, and determined that the additional evidence did "not provide a basis for changing the [ALJ's] decision."

---

[3] Dr. Ofomata was identified as the "attend/clinician" at Plaintiff's appointment at Metrocare on June 9, 2015. (R. at 437-41.)

(R. at 1-2.)

## II. LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *Id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.* at 436.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under

12

the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is

not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden

shifts to the Commissioner at step five to show that there is other gainful employment available in

the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This

burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations

or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304

(5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant

to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir.

2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review

is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents four issues for review:

A.     The ALJ erred in failing to address the functional impact of [Plaintiff's] obesity.

B.     The ALJ erred in finding that [Plaintiff] did not have a severe mental impairment, and in making such finding he failed to apply the correct standard.

C.     The ALJ erred in determining [Plaintiff's] RFC, and such finding is not supported by substantial evidence of record.

D.     The Appeals Council erred in failing to evaluate the treating source statement of Ikechukwu Ofomata, Ph.D.

(doc. 24 at 1, 11.)

### A.     **Obesity**

Plaintiff first argues that the ALJ erred when he failed to "address the functional impact" of

her obesity as required under SSR 02-1p. (doc. 24 at 9-10.)

Under SSR 02-1p, obesity itself is not a listed impairment, but it can reduce an individual's

occupational base for work activity in combination with other ailments. *See* SSR 02–1p, 2002 WL 34686281, at *3 (S.S.A. Sep. 12, 2002). "Obesity can cause limitation of function . . . [and an] individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching." *Id.* at *6. SSR 02–1p "does not state obesity necessarily causes any additional function limitations; rather, it provides obesity can cause such limitations." *Medrano v. Astrue*, No. A-09-CA-584-SS, 2010 WL 2522202, at *5-6 (W.D. Tex. June 17, 2010) (citing SSR 02-1p). The ALJ is not required to find any particular limitations of functions because of a claimant's obesity, and it should be considered in combination with other impairments in discussing the claimant's ability to perform sustained work activities. *See Beck v. Barnhart*, 205 F. App'x. 207, 212 (5th Cir. 2006) (citing SSR 02–1p). However, there "should be some indication in the administrative applications or medical record itself that a claimant's obesity has caused some level of functional limitation, has exacerbated other existing ailments, or has otherwise affected the claimant." *Robertson v. Berryhill*, No. 2:16-CV-249-J-BR, 2017 WL 6767373, at *6-7 (N.D. Tex. Dec. 11, 2017), *adopted by* 2018 WL 278674 (N.D. Tex. Jan. 2, 2018).

Here, the ALJ noted that Plaintiff "listed a broken hip and femur as the conditions limiting her ability to work;" she never identified any limitations due to her obesity. (R. at 21.) He reviewed all of her medical records, which contained no diagnosis for obesity or opinion as to any physical limitation due to obesity. (R. at 24-25.) During the RFC step, he determined that Plaintiff had the following abilities based upon her medical history and subjective complaints: lift/carry 50 pounds occasionally and 25 pounds frequently; sit/stand/walk for 6 hours out of an 8-hour workday; and unable to push/pull or operate foot controls using her right lower extremity. (R. at 26-29.)

15

Plaintiff contends that the ALJ erred by "fail[ing] to even acknowledge the existence of obesity" as a functional limitation because her height and weight during many of her physical exams placed her Body Mass Index[4] (BMI) in the obesity range. (doc. 24 at 10.) She also points to her pre-surgery evaluation at Baylor, when the internist noted that Plaintiff had high blood pressure, obesity, hyperglycemia, and hypokalemia. (R. at 288-91.) None of the medical records identify any functional limitations due to her obesity, formal treatment for her obesity, or even calculated her BMI. Neither Plaintiff nor her counsel alleged any limitations due to obesity during the hearing before the ALJ, but she now claims for the first time on appeal that "her obesity clearly had an adverse impact upon her ability to successfully complete rehabilitation of her hip and leg fractures, and compounded [her physical] residual limitations." (doc. 24 at 10.) She, however, fails to cite to any evidence in the record to demonstrate that her obesity exacerbated her other medical impairments or to where her physicians stated that her obesity imposed additional functional limitations. Accordingly, Plaintiff has not met her burden to show that her obesity impacted her physical or mental ability to sustain work activity, and this point of error is merely speculative. *See Robertson*, 2017 WL 6767373, at *6-7 (finding no error when the ALJ "did not mention or discuss plaintiff's BMI measurements or discuss plaintiff's qualifying obesity at any level of the sequential evaluation" because "there were no opinions from any medical sources concluding plaintiff had any limitations specifically due to his weight or any evidence or testimony that his weight exacerbated his other impairments, and [no] evidence to show either that additional limitations were warranted

---

[4]  The National Institutes of Health created parameters, which are relied upon in the Social Security Regulations, for measuring three levels of obesity based on a BMI. SSR 02-1p at *2. Level I obesity includes BMIs of 30.0 to 34.9; Level II includes BMIs of 35.0 to 39.9; Level III, also known as "extreme" obesity, includes BMIs greater than or equal to 40. *Id.* These classifications "describe the extent of the obesity, but they do not correlate with any specific functional loss." *Id.*

due to plaintiff's weight"); *see also Vogt v. Astrue*, No. 3:11-CV-315-BH, 2011 WL 5245421, at *11 (N.D. Tex. Nov. 2, 2011) (finding no error when the plaintiff "fail[ed] to cite to any evidence in the record to demonstrate that her obesity exacerbated her other medical impairments"). Remand is not required on this issue.

## B.  Severity Standard

Plaintiff next argues that the ALJ applied an improper standard to evaluate the severity of her mental impairments at Step Two in violation of *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). (doc. 24 at 11-15.)

### 1.  *Stone*

At Step Two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii),(c). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x. 899, 903 (5th Cir. 2010). Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone*, 752 F.2d at 1101, 1104-05. Accordingly, to meet the severity threshold at Step Two, "the claimant need only . . . make a *de minimis* showing that [the] impairment is severe enough to interfere with her ability to do work." *Anthony*, 954 F.2d at 294 n.5 (citation omitted). "Because a determination [of] whether an impairment[ ] is severe requires an assessment of the functionally limiting effects of an impairment[ ], [all] symptom-related

limitations and restrictions must be considered at this step." SSR 96-3P, 1996 WL 374181, at *2 (S.S.A. July 2, 1996). Ultimately, a severity determination may not be "made without regard to the individual's ability to perform substantial gainful activity." *Stone*, 752 F.2d at 1104.

Here, when identifying Plaintiff's severe impairments, the ALJ stated that Plaintiff's mental impairments did "not cause more than minimal limitations in [Plaintiff's] ability to perform basic mental work activities and [was] therefore nonsevere." (R. at 23.) The Commissioner "concedes that the ALJ did not reference *Stone* in his decision." (doc. 25 at 3.)

Unlike the ALJ's articulation of the severity standard, *Stone* provides no allowance for a minimal interference with a claimant's ability to work. *Stone*, 752 F.2d at 1104. Given the difference between these two constructions and the ALJ's failure to cite to *Stone*, he applied an incorrect standard of severity. *See Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010); *see also Lawson v. Astrue*, No. 4:11-CV-00426, 2013 WL 449298, at *4 (E.D. Tex. Feb. 6, 2013) (noting "while the difference between the two statements appears slight, it is clear that the [regulatory definition] is not an express statement of the *Stone* standard").

## 2. *"The Technique"*

Notwithstanding his application of an incorrect severity standard, the ALJ then applied what has been referred to as "the technique." (R. at 23-24.) It requires an ALJ to rate the degree of functional limitation regarding each medically determinable mental impairment he finds. 20 C.F.R. § 404.1520a(a). The degree of functional limitation is rated in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id*. at § 404.1520a(c)(3). If the ALJ rates the degree of limitation in the first three functional areas as "none" or "mild" and as "none" in the fourth area, the impairment will be found

18

not severe, unless there is evidence that indicates that there is more than a minimal limitation in the ability to do basic work activities. *Id.* at § 404.1520a(d)(1).

Courts have found that an ALJ has used the appropriate severity standard when he or she has utilized the technique to evaluate mental impairments. *See Andrews v. Astrue*, 917 F. Supp. 2d 624, 634-36 (N.D. Tex. 2013) (reviewing the ALJ's use of the technique set forth in the regulations for evaluation of mental impairments); *Andrade v. Astrue*, No. 4:11-CV-318-Y, 2012 WL 1106864, at *8 (N.D. Tex. Feb 13, 2012)(same). Although the technique does not contain the severity standard set forth in *Stone*, an ALJ's finding of no limitations or even mild limitations under the technique would not be inconsistent or contrary to *Stone*. *See White v. Astrue*, No. 4:08-CV-415-Y, 2009 WL 763064, at *11 (N.D. Tex. Mar. 23, 2009) (holding the ALJ's finding of nonseverity was not contrary to *Stone*, despite the ALJ's recitation of an improper standard of severity, where the ALJ applied the special technique set forth in the regulations for evaluating mental impairments and found mild deficits in her concentration, persistence or pace, as well as social functioning").

Here, that ALJ found that Plaintiff only had "mild limitations" in her activities of daily living, social functioning, and concentration, persistence, or pace. (R. at 23-24.) He further found that she had "no episode of decompensation." (R. at 23.) When making this determination, he specifically considered her medical records from Metrocare and Dr. Fletcher's psychiatric examination, as well her testimony from the hearing. (R. at 23.) He further noted that all of her "mental status examinations have been essentially within normal limits." (R. at 23.)

The ALJ's application of the technique when making his severity determination as to Plaintiff's mental impairments is sufficient to avoid reversal under *Stone*. *See Andrews*, 917 F. Supp. 2d at 635-36 (finding the ALJ's analysis of the claimant's mental impairments under the

technique was sufficient to avoid reversal pursuant to *Stone* and its progeny); *Andrade*, 2012 WL 1106864, at *8-9 (finding that although the ALJ cited conflicting severity standards, his determination under the technique that the claimant had no severe mental impairments was an implicit finding that her mental impairments had such minimal effect that they would not be expected to interfere with the claimant's ability to work, and was therefore sufficient to avoid reversal under *Stone*); *Martinez*, 2011 WL 3930219, at *7 ("[T]he Court concludes . . . that the ALJ's analysis of [the claimant's] depression under the technique, resulting in a finding that [the claimant] had only a mild impairment in the four functional areas, is sufficient to avoid reversal pursuant to *Stone* and its progeny.").

The ALJ's determination that Plaintiff had no severe mental impairment was also supported by substantial evidence, including the medical records from Metrocare that always noted how Plaintiff had an intact memory, a normal attention, normal thought process, fair insight, and "oriented x3" (R. at 439-40, 444), and the consultative examination with Dr. Fletcher, who opined that Plaintiff had an average intelligence, memory, concentration, judgment, and insight, even though she was "less than cooperative" during the assessment (R. at 393-96). Because the ALJ properly utilized "the technique," and substantial evidence supports his severity findings, remand is not required on this issue.[5] *See Walker v. Colvin*, No. 3:14-CV-1498-L-BH, 2015 WL 5836263, at *12 (N.D. Tex. Sept. 30, 2015) (finding no error when the ALJ's "utilization of 'the technique' support[ed] the conclusion that he ultimately applied the correct severity standard in evaluating Plaintiff's mental impairments").

---

[5] Plaintiff points out that the ALJ "totally ignored" Dr. Ofomata's medical assessment. (doc. 24 at 14.) This assessment, however, was not submitted until over a month after the ALJ's decision. (R. at 1-6, 465-69.) Dr. Ofomata's medical assessment is fully analyzed in Plaintiff's fourth issue regarding the Appeals Council's review of the newly submitted evidence.

## C.     **RFC Determination**

Plaintiff argues that the ALJ erred during the RFC determination because his findings "that [Plaintiff] could perform the physical demands of medium work, other than operation of foot controls and pushing/pulling with her right leg, is not supported by substantial evidence of record." (doc. 24 at 15.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1. The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ's determination necessarily includes an assessment of the nature and extent of a claimant's limitations and determines what the claimant can do "on a regular and continuing basis." *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) ("Both [20 C.F.R. § 404.1545 and SSR 96–8p] make clear that RFC is a measure of the claimant's capacity to perform work 'on a regular and continuing basis.'"). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that

supports her decision, or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994)

A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence". *See Johnson*, 864 F.2d at 343 (citations omitted).

In his decision, the ALJ specifically reviewed the medical records from Dr. Fletcher, Metrocare, Dr. Gordon, the SAMC, Dr. Okafor, Dr. Farley, and her MRI/X-ray results. (R. at 22-24.) Based upon those records, he found that Plaintiff had the severe impairments of "status post-right hip and femur fracture" and degenerative disc disease in the lumbar spine. (R. at 21.) The ALJ then detailed Plaintiff's allegations on her impairments, including how she testified that she could sit/stand for about 5-10 minutes, could walk only 2 houses down, and had to use a cane that she had not been prescribed. (R. at 27-28.) The ALJ found that her "medically determinable impairments could reasonably be expected to cause some symptoms," but her statements "concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (R. at 28.) He noted that Plaintiff had "sought little actual follow-up care for the impairment involving [her]

lower extremity," had not been "prescribed any medication or other therapy modes by any specialist," "at least two diagnostic studies of her right leg and hip [had] shown no abnormalities," and her consultative exam showed "5/5" motor strength with sensory measurements. (R. at 28.) He further noted that Plaintiff's allegations that she was unable to cook or perform chores were "difficult to reconcile with the fact that she apparently has custody of her son and lives with him and no others." (R. at 28.) He gave significant weight to the consultative examiners' assessments, considerable weight to the SAMC, and little weight to the assessments from Dr. Okafor because of the "vagueness of the opinion, the absences of narrative treatment notes, and the record as a whole." (R. at 29.) He agreed with the SAMC that Plaintiff was capable of performing "medium" work, but he included additional exertional and postural limitations to her right lower extremity. (R. at 26.) The ALJ ultimately determined that Plaintiff retained the RFC to perform medium work with the following limitations: lift/carry 50 pounds occasionally and 25 pounds frequently; sit/stand/walk for 6 hours out of an 8-hour workday; unlimited ability to push and pull (including operation of hand and/or foot controls) on the left side; and unable to push/pull or operate foot controls using her right lower extremity. (R. at 26-29.)

Plaintiff contends that the medical evidence "contradicts" the ALJ's determination of her physical limitations. (doc. 24 at 15, 20.) She points to Drs. Gordon's and Farley's medical records, as well as her X-ray results, to argue that "[i]t is incredible to believe that a person who due to traumatic injury has had a plate and screw inserted into her hip, and a plate, rod and screw inserted into her right leg . . . could possibly perform the 6 hours of standing and/or walking required of medium work." (*Id*. at 16-17.) The ALJ specifically reviewed and addressed these medical records in his decision, however. (R. at 26-29.) Dr. Gordon found that her active range of motion in her right

hip was "diminished and performed with noted discomfort," but during the sensorimotor examination, he found that her motor muscle strength was "5/5" in all of her upper and lower extremities and her sensory function was "intact along all dermatomal distributions bilaterally." (R. at 403.) Dr. Farley similarly found that her range of motion showed "restricted forward flexion" in her right knee, but her lower extremity muscle strength and sensation was rated at "5/5" or normal for all areas, where she could stand on her toes/heels and could "perform tandem gait." (R. at 389-90.) Her X-ray results were consistent with the medical examinations, and they showed "no acute abnormalities" in her right femur, other than the surgically implanted plate and compression screws, and "hypertrophic bony spurs arising from the articular margins" in her right knee with "no fractures or dislocations." (R. at 447-49.) After considering the reports from the examining physicians, the ALJ determined that the SAMC's RFC assessment should be further limited based upon the evidence of record, and he included several physical limitations on her right lower extremity to the RFC consistent with the examining physicians' assessments. (R. at 26, 29-30.) The decision does not show that medical evidence "contradicts" the ALJ's RFC finding; it shows that the ALJ fulfilled his role as the finder of fact to weigh the evidence in the record, resolve all conflicts in the evidence, and make an administrative assessment of Plaintiff's ability to work.[6] *See Dise v. Colvin,* 630 F. App'x 322, 326 (5th Cir. 2015) (holding that a "diagnosis is not, itself, a functional limitation"); *see*

---

[6] Plaintiff points out that even though she was never prescribed a cane, "there is also no indication in the record that [Plaintiff] was discouraged from using an assistive device." (doc. 24 at 17-18.) To the extent that she argues that the use of a cane should have been included in the RFC, Plaintiff fails to meet her burden to show that she required a cane to ambulate, and substantial evidence in the record supports the ALJ's refusal to include the use of a cane in the RFC. *See Johnson v. Berryhill,* No. 3:15-CV-3961-BH, 2017 WL 1105720, at *11 (N.D. Tex. Mar. 24, 2017) (finding no error when the ALJ did not incorporate use of a cane in the RFC because "none of the records state that it was medically necessary, and they instead simply note that she brought her own cane with her to the evaluations"); *see also Stewart v. Colvin,* No. 1:12-CV-039-BL, 2013 WL 1979738 at *5 (N.D. Tex. May 14, 2013) (finding no error when the ALJ failed to incorporate the use of a cane in the RFC because the record contained no evidence regarding the medical basis for the cane and there was "no physician's report regarding specific medical restrictions requiring [the claimant] to use an assistive device").

*also Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (explaining that "[t]he mere presence of some impairment is not disabling *per se*").

Plaintiff further contends that the ALJ was "simply incorrect" in his review of Dr. Okafor's medical records and "play[ed] doctor"[7] when he rejected his medical assessment on her physical limitations.[8] (doc. 24 at 19-20.) The ALJ's decision noted that Dr. Okafor opined that Plaintiff was "limited to a significantly less than sedentary range of exertional activities," but this opinion failed to provide a "sufficient nexus to a medically determinable impairment reasonably capable of producing the symptoms and limitations." (R. at 29.) He noted that the record contained only "four handwritten notes for only four clinic visits in 2013," where "none contain[ed] objective evidence pertaining to her examination of [Plaintiff's] right knee, hip, or lower back." (R. at 29.) He also noted that "Dr. Okafor made reference to 'see X-ray'" in his medical assessment, but the X-ray reported "no acute abnormalities." (R. at 29.) Plaintiff contends that this assessment was "an inaccurate reading of the evidence of record" because the X-rays also showed the existence of the surgically implanted screws, and because Dr. Okafor identified hip tenderness during one appointment in 2013 when she referred her to physical therapy for "lower extremity strengthening and adduction strengthening." (doc. 24 at 19-20) (citing R. at 410-11, 417, 427, 447.)

While Dr. Okafor did refer her to physical therapy, her medical records are devoid of any objective findings of Plaintiff's impairments, except for a notation of "tenderness" in her hip from a limited physical examination that occurred over two years before Dr. Okafor made her medical

---

[7]  The phrase "playing doctor" was used in *Frank v. Barnhart*, 326 F.3d 618, 621-22 (5th Cir. 2003), which held that the ALJ erred when he drew his own medical conclusions that were contrary to the claimant's subjective statements and the weight of "vast" medical evidence.

[8]  Plaintiff does not argue that the ALJ failed to properly analyze Dr. Okafor's medical assessment as a treating source opinion pursuant to 20 C.F.R. § 404.1527. (*See* doc. 24 at 15-20.)

assessment. (R. 334, 457-64.) The record does not show that Dr. Okafor formally treated Plaintiff's injuries over a period of time or even prescribed any medication other than for hypertension. The medical record, including Dr. Gordon's consultative assessment and Dr. Okafor's own medical records, do not support the finding that Plaintiff was limited to a significantly less than sedentary RFC. (R. at 308, 334, 400-07, 432.) The ALJ was not "playing doctor" in his decision, and substantial evidence supports the determined RFC. *See Coats v. Colvin*, No. 3:12-CV-4968-M, 2013 WL 6052879, at *5 (N.D. Tex. Nov. 14, 2013) (noting that an ALJ "is not playing doctor by determining which of contradictory medical opinions to credit [because] that is precisely the type of conflict he is called upon to resolve") (citing *Perez*, 415 F.3d at 461). As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available and the record as a whole. *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (quoting *Newton*, 209 F.3d at 458). Accordingly, a reviewing court must defer to the ALJ's decisions. *See Leggett*, 67 F.3d at 564. To the extent that Plaintiff complains of the failure to include more restrictive physical limitations in the RFC, the ALJ did not err, and remand is not required on this issue.

**D.      New Evidence to Appeals Council**

In her final issue, Plaintiff argues that the Appeals Council erred by "failing to evaluate the treating source statement of Dr. Ofomata." (doc. 24 at 20-22.)

When a claimant submits new and material evidence that relates to the period before the date of the ALJ's decision, the Appeals Council must consider the evidence in deciding whether to grant a request for review. 20 C.F.R. § 404.970(b). The regulations do not require the Appeals Council to discuss the newly submitted evidence or to give reasons for denying review. *See Sun v. Colvin*,

793 F.3d 502, 511 (5th Cir. 2015).  New evidence submitted to the Appeals Council becomes part of the record upon which the Commissioner's decision is based.  *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005).  A court considering the Appeals Council's decision must review the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence, and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes unsupported.  *Higginbotham v. Barnhart*, 163 F. App'x 279, 281-82 (5th Cir. 2006); *Morton v. Astrue*, No. 3:10–CV–1076–D, 2011 WL 2455566 at *7 (N.D. Tex. June 20, 2011) ("The proper inquiry concerning new evidence takes place in the district court, which considers whether, in light of the new evidence, the Commissioner's findings are still supported by substantial evidence.") (citations omitted).

Newly submitted evidence is material if: (1) it relates to the time period for which the disability benefits were denied; and (2) there is a reasonable probability that it would have changed the outcome of the disability determination. *Castillo v. Barnhart*, 325 F.3d 550, 551-52 (5th Cir. 2003). Evidence of a later-acquired disability or a subsequent deterioration of a non-disabling condition is not material. *Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir. 1985). Generally, "the Commissioner need 'not concern evidence of later-acquired disability or of the subsequent deterioration of the previously nondisabling condition,'" because it fails to meet the materiality requirement. *Powell v. Colvin*, No. 3:12-CV-1489-BH, 2013 WL 5433496 at *11 n.9 (N.D. Tex. 2013) (quoting *Johnson*, 767 F.2d at 183).  Post-dated records may meet the first prong of materiality, however, as long as the records relate to the time period for which disability benefits were denied. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995) (holding that new evidence of scar tissue related to the adjudicative period because it resulted from a prior surgery).

When she appealed the ALJ's decision to the Appeals Council, Plaintiff submitted a Medical Assessment of Ability to do Work-Related Activities (Mental) that was completed by Dr. Ofomata of Metrocare on January 26, 2016. (R. at 466-69.) He opined that Plaintiff had "some loss" in: understanding and carrying out instructions; sustained concentration and persistence; and responding appropriately to supervision, co-workers, and usual work situations. (R. at 466-67.) She also had "substantial loss of ability" to adapt to changes in a routine work setting. (R. at 467.) The Appeals Council denied her request for review on December 20, 2016, and determined that the additional evidence did "not provide a basis for changing the [ALJ's] decision." (R. at 1-2.)

Plaintiff contends that the Appeals Council should have formally weighed Dr. Ofomata's assessment as a treating source opinion under the six factors[9] in 20 C.F.R. § 404.1527(c) and also had to "provide good cause" before rejecting this opinion. (doc. 24 at 21-22.) She fails to point to any authority requiring such an extensive analysis of new evidence when the Appeals Council denies a request for review, however.[10] *See Sun*, 793 F.3d 502, 511 (5th Cir. 2015) (explaining that the "[social security] regulations do not require the AC to provide a discussion of the newly submitted evidence or give reasons for denying review"); *see also Jones v. Astrue*, 228 F. App'x 403, 407 (5th Cir. 2007) (refusing to accept the plaintiff's argument that "the district court should have remanded the case because the Appeals Council did not explain the weight that it gave to [the plaintiff's] new

---

[9] If controlling weight is not given to a treating source's opinion, the ALJ considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." 20 C.F.R. § 404.1527(c)(1)–(6).

[10] As support, Plaintiff cites to what she claims is a 2011 opinion from the Fifth Circuit Court of Appeals. (doc. 24 at 22) (citing to "*Holmstrom v. Massanari*, 270 F.3d 715, 720 (5th Cir. 2011)"), but which is actually a 2001 opinion from the Eighth Circuit Court of Appeals, and it also does not support her contention that the Appeals Council must explicitly weigh the six factors when declining to afford controlling weight to a treating source opinion. *See Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001).

evidence" because "we determined that such an explanation was not required"). Even if the Appeals Council did have to explicitly consider all six factors before declining to afford controlling weight to a treating source's opinion, Plaintiff has not shown that Dr. Ofomata is a treating source. Other than the assessment that he submitted after the ALJ rendered his decision, Dr. Ofomata was mentioned only once in the medical record as the "attend/clinician" at Plaintiff's appointment at Metrocare on June 9, 2015, and there are no medical documents in the administrative record that Plaintiff ever met with Dr. Ofomata or that he signed off on her records.[11] (R. at 437-41); *see* 20 C.F.R. § 404.1502 (explaining that a treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant); *see also Hernandez v. Heckler*, 704 F.2d 857, 860-61 (5th Cir. 1983) (affirming finding that a doctor who saw claimant twice in a 17 months was not a treating physician).

Dr. Ofomata's medical opinion also post-dates the ALJ's decision by over a month and does not state whether his assessment covers the period considered in the ALJ's decision. (*See* R. at 465-69.) Even assuming that the assessment relates to the time period at issue, it is inconsistent with both Dr. Fletcher's consultative opinion and Metrocare's own medical records. Reviewing the record as a whole, the new evidence did not dilute the record to the extent that the ALJ's decision became insufficiently supported. The ALJ's finding on Plaintiff's functional limitations due to any mental

---

[11] To the extent that Plaintiff is arguing that Metrocare Services itself should be considered a "treating physician" and given controlling weight, courts in this district have differentiated between the medical opinions of various doctors at Metrocare when considering the opinions of treating physicians. *See, e.g., Payne v. Colvin*, No. 3:14-CV-2557-BH, 2016 WL 5661647, at *12 (N.D. Tex. Sept. 28, 2016) (finding no error when the ALJ determined that a Metrocare "supervising psychiatric" was not a treating source because it was "not clear if she actually examined the plaintiff in person because the 'service provider' listed by Metrocare Services was actually [a different individual]"); *Bookman v. Colvin*, 3:13-CV-4428-B, 2015 WL 614850, at *8 & n.3 (N.D. Tex. Feb. 12, 2015) (noting the inconsistency between the medical records of the treating physician at Metrocare and other Metrocare professionals).

impairment were still supported by substantial evidence, and the Appeals Council did not err. *See Morton*, 2011 WL 2455566 at *7 (stating that if, "in light of the new evidence, the [ALJ's] findings are still supported by substantial evidence," the Court must affirm the Commissioner's decision.). Remand is not appropriate on this ground.

**IV. CONCLUSION**

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** this 13th day of March, 2018.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE